New York Interurban Water Company, Plaintiff, *v.* The City of Mt. Vernon et al., Defendants.

(Supreme Court, Westchester Special Term, February, 1920.)

Municipal corporations — city of Mount Vernon — ordinances — water companies — power to make rates for supplying water to a municipality is vested only in the state.

The power to make rates for supplying water to a municipality is vested only in the state and in such bodies, commissions and municipal authorities to which the state may delegate such power.

Twelve years after its incorporation plaintiff, a water company, which supplies the defendant city and its inhabitants with water for hire, increased the rate to be charged to its customers, and when six years later plaintiff gave notice to its customers that new and increased rates would be put into operation at a specified date, the common council of the defendant passed an ordinance which forbade any increase over the then existing rates, " either for service or consumption of water or both, unless and until after the expiration of a full period of thirty days after there shall have been a final determination by a court of competent jurisdiction that such proposed new rate is fair and reasonable," etc. *Held,* that the ordinance in effect made the defendant the rate-making power, and there having been no delegation by the state of rate-making or regulatory power over plaintiff granted to the defendant, the ordinance, so far as it attempts to fix or regulate water rates to be charged by plaintiff, is illegal and void, and

Supreme Court, February, 1920. [Vol. 110.

plaintiff was entitled to determine and fix the rates to be charged subject, however, to a judicial review as to whether such rates are fair and reasonable.

The defendant, having been successful on the question of the reasonableness of the new rates sought to be established, the plaintiff asking an adjudication of said question, the judgment to be entered herein will be without costs to either party.

Action in equity.

Arthur M. Johnson, for plaintiff.

J. Henry Esser (Joseph S. Wood, of counsel), for defendants.

Tompkins, J. The plaintiff brings this action in equity for two purposes: *First,* to have it adjudged that the ordinance marked " Exhibit C " and annexed to the complaint, relating to the rates to be charged by the plaintiff and regulating the plaintiff's service of the city of Mt. Vernon and its inhabitants, was and is illegal and void; and *second,* that the plaintiff's new rates which were to have become effective September 1, 1919, are fair and reasonable.

The plaintiff is a domestic corporation engaged in the business of supplying water for hire to the city of Mt. Vernon and inhabitants thereof and other communities in the county of Westchester, and was incorporated in June, 1901, and thereupon took over the property and franchises of the New York Suburban Water Company, and thereafter several other water companies were merged in the plaintiff.

In 1913, the plaintiff increased its water rates, whereupon an action was brought by one of its customers, one David L. Whitmore, to enjoin the plaintiff from collecting its new rates and judgment was entered in

that action in July, 1914, by which said new rates were adjudged to be fair and reasonable; that the rates then established were continued until 1919, when the plaintiff, on July 31 of that year, gave notice to its customers that on and after September 1, 1919, new rates would be put in operation, whereupon the common council of the city of Mt. Vernon adopted and promulgated the ordinance, the validity of which is here involved, and marked " Exhibit C " of the complaint. This ordinance, in effect, fixes the rates to be charged by the plaintiff because it forbids an increase over the rate then in effect, " either for service or consumption of water or both, unless and until after the expiration of a full period of thirty days after there shall have been a final determination by a court of competent jurisdiction that such proposed new rate is fair and reasonable, and in accordance and compliance with the statute in such cases made and provided."

The effect of this ordinance is to make it impossible for the plaintiff to increase its rates and thereby the city makes itself the rate-making power. Such rate-making or regulating power does not exist in the city of Mt. Vernon. It has not been granted to this municipality by the state. Such power is vested only in the state, and in such bodies, commissions and municipalities as the state may clothe with such power. There has been no delegation of rate-making or regulatory power over the plaintiff granted to the city of Mt. Vernon. Hence it follows that the ordinance in question, so far as it attempts to fix or regulate water rates to be charged by the plaintiff, is illegal and void, and inasmuch as the state has not given such rate-making power to any body, or board, the plaintiff may determine and fix for itself the rates to be charged its customers subject to the power of the court to

Supreme Court, February, 1920.        [Vol. 110.

review the same and determine whether they are fair and reasonable.

Counsel for the city of Mt. Vernon argues with much force that under its charter and the powers thereby conferred for the protection of the public health and safety, and the general welfare of the corporation and its inhabitants, the city has power, by ordinance, to prevent the cutting off of its water supply, but the authorities all seem to hold that the power to fix rates is never delegated by implication and that no municipality, board or commission may exercise such power unless it is clearly and unmistakably granted by the state, and in the absence of such a grant, or of a rate prescribed by the state, the company may fix its own rates, subject always to that old and well-established rule that rates must be fair and reasonable and pending a determination of the fairness of rates, a court of equity would protect a municipality against danger to its health and safety.

The plaintiff, by this action, also seeks an adjudication that its new water rates, rules and regulations are fair and reasonable, while the defendants insist that such rates are unfair and excessive, and both sides ask for a determination of that question.

The questions involved in a determination of this controversy are:

*First,* what is the present fair value of the plaintiff's water works property in the public service?

*Second,* what is a fair return on such value?

*Third,* what allowance shall be made for depreciation?

*Fourth,* what is the net income?

If what is determined to be a fair return on the value of the plaintiff's property in the public service and a fair allowance for depreciation, equal or exceed

the net income under the new rates, then it must be held that they are fair and reasonable.

What is the present fair value of the plaintiff's water works property in the public service? This must be determined by a consideration of all the material and relevant facts. '' The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.'' *Minnesota Rate Cases,* 230 U. S. 352, 434.

There are many elements to be taken into account. The cost of reproduction less accrued depreciation cannot alone control in fixing the present value of plaintiff's property because reproduction cost at present high prices would not be fair to the public, and the question of the permanency or duration of present high prices is so problematical that present cost of reproduction cannot be taken as the principal or controlling element, and resort must be had to some fairer method of determining the present value of the plaintiff's property.

The defendants claim that the original cost should be the court's first guide. The original cost of the plaintiff's property is in serious dispute. Plaintiff claims that it was approximately $1,250,000, while the defendants' contention is that the original cost in 1901 did not exceed $650,000.

In the *Whitmore* case, in 1913, already referred to, the court fixed the value of the plaintiff's property in the public service at that time at the sum of $2,054,-174.46, and I have decided to adopt that judicial determination as to the value at that time, deducting therefrom such amounts as were obviously improperly included because of errors of fact, and by making such

other deductions and additions thereto as are necessary and proper because of changed conditions.

This method of arriving at the present value of the plaintiff's property was approved by Judge Hughes, as referee, in the *Brooklyn Borough Gas Company Case*, 17 St. Dept. Rep. 81, in which, after referring to the present abnormal conditions and prices, owing to the war, he says: "If, however, we are not to take actual cost of reproduction at the present time, or within a year or so because it would be an abnormal cost and we are to seek some fairer basis of estimating the value of plaintiff's property for the purpose of determining the validity of rates, it would be difficult to find any basis more just than the appraisal made by public authority and based on reproduction cost before the outbreak of the European War, with proper consideration of actual investment since that time."

The court in the *Whitmore* case based the valuation above stated of $2,054,174.46 upon the cost of reproduction in 1913 when prices were normal, after deducting accrued depreciation. We, therefore, start with the value of the plaintiff's property in the public service in the year 1913 as the sum of $2,054,174.46. To this amount we will first add the increase since 1913 in the value of lands, structures thereon and rights of way owned by the plaintiff and now a part of and used in the water works business. In estimating the value of the plaintiff's real estate, the Yonkers reservoir site, the Mamaroneck high level reservoir site, the Harrison water company lot and artesian well thereon will be eliminated, because not now in use by the plaintiff as parts of its system.

In the *Whitmore* case in 1913 the court fixed the sum of $387,760 as the value of the real estate and improvements thereon then in the public service,

together with the rights of way and water rights. After careful consideration of the testimony of the witnesses and all the facts developed upon the trial and the briefs and tabulated statements of counsel, I have reached the conclusion that there should be an increase allowed to the plaintiff over the 1913 valuation for the real estate, rights of way and riparian rights of $77,552. There should be added to the Whitmore appraisal the sum of $127,826.10, being the amount expended since the decision in the *Whitmore* case for extensions. There was an allowance in the *Whitmore* case of $10,000 for working capital. That, I think, under present conditions, should be increased to $30,000, making an increase of $20,000 to be added to the Whitmore valuation.

The next item to be considered is the question of " going value," for which the sum of $100,000 was allowed the plaintiff in the *Whitmore* case. The plaintiff claims that this item should be materially increased while the defendants insist that it should be eliminated altogether.

In the case of *People ex rel. Kings County Lighting Co.* v. *Willcox,* Judge Miller, writing for the Court of Appeals, said: " I define ' going value ' for rate purposes as involved in this case to be the amount equal to the deficiency of net earnings below a fair return on the actual investment due solely to the time and expenditures reasonably necessary and proper to the development of the business and property to its present stage, and not comprised in the valuation of the physical property." 210 N. Y. 479.

In *Des Moines Gas Company* v. *Des Moines,* 238 U. S. 153, 165, the court said: " Included in ' going value ' as usually reckoned is the investment necessary to organizing and establishing the business which is not embraced within the value of its actual physical prop-

erty. In this case, what may be called the inception cost of the enterprise entering into the establishing of a going concern had long since been incurred. The present company and its predecessors had long carried on business in the City of Des Moines, under other ordinances, and at higher rates than the ordinance in question established. For aught that appears in this record, these expenses may have been already compensated in rates charged and collected under former ordinances. As we have said, every presumption is in favor of the legitimate exercise of the rate-making power, and it is not to be presumed, without proof that a Company is under the necessity of making up losses and expenditures incidental to the experimental stage of its business.''

In determining whether the plaintiff is to be entitled to a '' going value '' it must be borne in mind that in 1901 it took over an established and going concern, and did not start the water business, but continued, extended and expanded an already established enterprise; and in the absence of proof to the contrary, it must be assumed that its income was sufficient to pay a fair return upon its actual investment and the burden of proving otherwise rests upon the plaintiff, and that burden, I think, has not been discharged in this case.

The plaintiff's witness George W. Fuller testified that he would not have made an allowance for '' going value '' if there had been no deficiency in earnings, and there were no deficiencies in earnings of the company from its inception in 1901, unless we are to assume that the plaintiff's actual investment in 1901 when it purchased the property in question was the sum of $1,250,000, represented by the bond issue for that amount.

In my opinion, the property taken over by the plain-

tiff at that time was not reasonably worth $1,250,000 and that the bond issue did not represent the fair value of the property.

The plaintiff's witness Ledoux, who upon this trial fixed the present value of the plaintiff's property at $3,000,000 and upwards, made an inventory and appraisal in 1901 of all the property purchased by the plaintiff from its predecessors in title. This was done for the plaintiff, and his report, dated August 19, 1901, made to the plaintiff at that time giving the items of property and his estimates of their values, was put in evidence upon this trial and marked defendant's " Exhibit A" of November 15, 1919, and it shows an aggregate valuation of all the properties and rights acquired and taken over by the plaintiff in 1901 as $646,664.52, and in that inventory and report furnished to the plaintiff, after giving in detail the items of property and their respective values, he made the following statement: " The inventory of the value of the property shows assets equal to $1,067,500. You will note that the prices fixed in my valuation which are fair prices according to my best judgment, amount to $646,664.52."

And upon this trial the witness Ledoux testified that in his judgment the plaintiff's plant cost in the neighborhood of $1,000,000 in 1901, and then the following questions were asked and answers given: " Q. And you made some mention of some other items that ought to figure in the cost of the plant and what items did you leave out of your estimate of $1,000,000 back in 1901, was that all inclusive up to that time? A. That was inclusive according to my best judgment at that time, about a million dollars, in that neighborhood. Q. Nothing was left out? A. Nothing was left out."

And then what is called the " historical cost " of

$627,000 taken largely from the books of the company prior to 1901, by the defendants' witness Eckes, who testified from his examination of the books and papers of the company that it received a fair return upon its actual investment and gave it as his expert opinion that the plaintiff was not entitled to an allowance for "development cost" or "going value." The capitalization fixed by the plaintiff in 1901 was in my opinion larger than the actual value of its property, and it was not then justified in anticipating that it could earn a fair return upon such capitalization and I think that the fair return to which the plaintiff is entitled is to be reckoned upon the fair value of its property and its actual investment therein, rather than upon an overissue of securities and I think the plaintiff has failed to show that there was a deficiency in earnings in the early days of the company, which should now be made up by an allowance for development cost or "going value." Therefore, in adopting the value of the plaintiff's property as fixed by the judgment in the *Whitmore* case the $100,000 therein allowed for "going value" will be deducted and no allowance made therefor.

I will follow the decision in the *Whitmore* case and make no allowance to the plaintiff for service taps.

Plaintiff's counsel concedes that plaintiff is entitled to no allowance for street paving.

I will increase the allowance made in the *Whitmore* case for working capital from $10,000 to $30,000.

The company's books show as set up a depreciation or replacement reserve of $63,202.56, September 30, 1919. This should be deducted from the sum of $129,-885.91, which was the amount of accrued depreciation carried into the referee's figures in the *Whitmore* case and the balance of $66,683.25 being the amount of accrued depreciation overcome by appreciation should

be added to the value of the referee's appraisal in the *Whitmore* case.

The defendants claim that deductions should be made from the valuation fixed in the *Whitmore* case from the allowance made by the referee for excavation and rip-rap in the Mahlstedt and Lester reservoirs. The record in the *Whitmore* case shows that the following quantities were claimed by the company and not disputed by the plaintiff: Mahlstedt reservoir, excavation, 75,000 cubic yards at 50 cents, $37,500; rip-rap, 7,570 cubic yards at $2.50, $18,920; Lester reservoir, excavation, 10,800 cubic yards at 60 cents, $6,480.

The defendants' engineer Everett as the result of an actual survey recently made gave his conclusions as to the actual quantities as follows: Mahlstedt reservoir, excavation, 16,000 yards; rip-rap, 5,000 yards; Lester reservoir, excavation, 5,000 yards, which makes a difference of $33,688 in these items between the amount allowed by the referee in the *Whitmore* case and that now claimed by the defendants.

I think the greater weight of evidence is with the plaintiff on this subject. Plaintiff's witnesses Ledoux and George W. Fuller testified to the same number of cubic yards of excavation as that fixed by the judgment in the *Whitmore* case and their testimony has the support of the inventory made by Ledoux in 1901; and besides, the opinion of Judge Young, the referee in the *Whitmore* case, shows that he adopted the measurements and values given by Mr. Harding who was the plaintiff's witness in that case.

On the defendants' part, in the case at bar, Weston E. Fuller conceded that he had no accurate knowledge on the subject, so that the defendants' claims with respect to this item had only the support of their witness Everett, whose survey and computations could

not have been accurate in view of the elevations of
his survey, and his lack of knowledge of original con-
ditions.   I think I shall let the allowances made for
these items in the *Whitmore* case stand.

With respect to rock excavation the referee in the
*Whitmore* case allowed for 80,272 yards at three dollars
per yard, which was based upon the undisputed
testimony of the plaintiff's witness Harding.   This
was evidently a mistake because the plaintiff's wit-
ness George W. Fuller testified that in 1916 he found
the actual amount of rock excavation to be less than
the former estimates had been, and the plaintiff's
witness Ledoux now only claims 46,300 yards of rock
excavation as of 1919.   Deducting from this amount
(for construction since Whitmore judgment, five and
eight-tenths per cent being percentage of construction
since 1913) 2,600 yards leaves 43,760 yards, and that
deducted from the 80,272 yards allowed in the *Whit-
more* case, leaves 36,512 at three dollars per yard
amounting to $109,536 which must be deducted from
the Whitmore valuation, together with fifteen per
cent thereon allowed in the *Whitmore* case for over-
heads making the total deduction from the Whitmore
valuation on account of rock excavation, $118,740.

The item of $38,776 allowed in the *Whitmore* case
for interest on land must be now disallowed and
deducted from the valuation of the plaintiff's prop-
erty, because of the decision in the Minnesota rate
case. *Simpson* v. *Shepard,* 230 U. S. 352.

The item of $71,554.21 for interest on construction
allowed in the *Whitmore* case should stand, except
that five per cent shall be deducted from the excess
rock excavation, which is hereby disallowed.

A recapitulation of the items, allowances, additions
and deductions making up the present value of the
plaintiff's property in the public service is as follows:

| | | |
|---|---|---|
| Valuation fixed by Whitmore judgment ............... | | $2,054,174 46 |
| *Additions* | | |
| Increase in value of real estate, rights of way and water rights ............. | $77,552 00 | |
| New extensions ............ | 127,826 10 | |
| Additional working capital allowed ................. | 20,000 00 | |
| Increase by appreciation except depreciation reserve shown by company's books, the same being in excess of tangible depreciation ...:. | 66,683 35 | |
| | | 292,061 45 |
| | | $2,346,235 91 |
| *Deductions from Whitmore case valuation.* | | |
| Going value ..............$100,000 00 | | |
| Excessive rock excavation allowed for in *Whitmore* case .................... | 118,740 00 | |
| Interest on land............ | 38,776 00 | |
| Five per cent interest on construction on rock excavation now disallowed, being five per cent on $118,740....... | 5,937 00 | |
| | | 263,453 00 |
| Making the sum of...... | | $2,082,782 91 |

the present value of the plaintiff's property in the public service, and which I hereby fix as the rate base and upon this amount the plaintiff is entitled to a fair net return.

Supreme Court, February, 1920. [Vol. 110.

In the *Whitmore* case this was fixed at six per cent. The plaintiff now asks for eight per cent while the defendants insist that six per cent is reasonable.

In view of the present and future hazards of the plaintiff's business and the condition of the money market and the difficulty with which bonds and stock of public utility corporations are now sold, a six per cent rate of interest would hardly attract investors. Annexation of the city of Mt. Vernon with the city of New York is possible and has been urged by many. In that event, the plaintiff could not successfully compete with the water system of the greater city. Besides, the city of Mt. Vernon has obtained leave from the legislature to build its new water works system and has recently, by an overwhelming majority, voted in favor of such an enterprise.

Taking into consideration all of the facts, I am convinced that a seven per cent return on the value of the plaintiff's property will be a moderate and conservative allowance, and at that rate of interest upon the valuation of the plaintiff's property in the public service above fixed of $2,082,782.91, the plaintiff will be entitled to a net annual income of $145,794.80.

I will fix as the probable annual gross income under the new rates the sum of $350,000. The annual operating expenses have materially increased since 1918 when the plaintiff's operating expenses including taxes and an allowance for depreciation were $154,960.50 according to the defendants' computation of revenue and expenses taken from the tax report of December 31, 1918. The plaintiff now claims that its operating expenses for the year 1920 including taxes and a depreciation reserve of $23,000 will be $175,990.80, and this seems to me to be reasonable and will be allowed, and deducting that amount from the gross income of $350,000, there will be a net income of

$174,010, which will be about $30,000 in excess of seven per cent on the value of the plaintiff's property as found above, to wit, $2,082,782.91. It follows therefore that the plaintiff's new rates are not fair or reasonable.

In reaching all of my conclusions, I have given careful consideration to all of the elements that in my opinion enter into the proper determination of this case, and all of the matters to which counsel with much ability and great thoroughness called my attention by their oral arguments and their well-prepared briefs.

Inasmuch as the plaintiff has succeeded in this action with respect to the ordinance, while the defendants have won on the question of the reasonableness of the new rates, the judgment to be entered hereon will be without costs to either party.

Judgment accordingly.