TOWN OF MAMARONECK and Others, Plaintiffs, *v.* THE NEW YORK INTERURBAN WATER COMPANY, Defendant.*

Supreme Court, Westchester County, August 6, 1925.

Waters and watercourses — public water supply — injunction — action to procure judgment declaring schedule of increased water rates unreasonable and oppressive and to enjoin water company from collecting said increased rates — water company obligated under franchises pursuant to Transportation Corporations Law, § 81, to furnish water to plaintiffs at reasonable rates — unreasonable rates may be restrained by injunction — private consumer entitled to challenge rate agreed upon by municipality and water company — water company not estopped from raising its rates by representation in prior action for injunction restraining it from disposing of part of its property or by findings therein — elements to be considered in determining rate base and rates — what constitutes reasonable return on investment — elements to be considered in determining fair valuation — rates unreasonable — res adjudicata — judgment in prior action to restrain water company from disposing of part of its property not res adjudicata that rates fixed in 1920 were excessive — customers paying excess in rates during pendency of action entitled to refund — reasonableness of rate for public fire hydrants — court may determine what rates may not be charged under menace of cutting off service to consumers — judgment granted restraining water company from threatening to discontinue service to plaintiffs and directing refund of excess rates paid during pendency of action.

Municipalities and individuals, resident therein, consumers of water supplied by a water company incorporated under the Transportation Corporations Law, may maintain an action to enjoin said water company from charging unreasonable rates fixed in its schedule of increased water rates, on the ground that the water company is obligated by section 81 of the Transportation Corporations Law to furnish water at reasonable rates and costs.

* See, also, 198 App. Div. 396.

A private consumer of water may maintain an action to restrain the collection of increased water rates in spite of the fact that said rates exist by reason of the agreement between the water company and the municipality in which he is a resident.

In an action by the plaintiffs, municipalities and individuals therein resident, who are consumers of water supplied by the defendant water company, for a judgment declaring a schedule increasing water rates and charges effective March 1, 1924, made public prior thereto by the defendant, as unreasonable, unlawful and oppressive, and to permanently enjoin said company from collecting such increased rates, defendant, as a matter of law, is not estopped from increasing its rates if the increased rates are fair and reasonable under all the circumstances, notwithstanding the fact that in a prior injunction action to restrain the proposed sale by the water company of part of its plant located in the city of Mount Vernon, it was emphatically contended by it that it could, in spite of the proposed sale, discharge its statutory duty to furnish water at reasonable rates to the municipalities in the outlying districts, including plaintiff towns and the inhabitants thereof, in the absence of any representation or promise that it would continue to serve its consumers remaining after the sale to the city of Mount Vernon at the rate then in force, particularly since a finding in the judgment therein determined as a fact that the water company " has made no statement of what it intends to charge for water with Mount Vernon cut out   *   *   *."

It cannot be presumed, although there was no proof to the contrary, that, under all the circumstances the increased rates are fair and reasonable within the meaning of section 81 of the Transportation Corporations Law, particularly where the schedule of rates was challenged and contested by the consumers at the time they were made public and before they took effect.  Nor may the basis for the increased rates be predicated upon the fact that the water company, having sold a part of its plant to the city of Mount Vernon, where the great majority of its consumers live and the greater volume of its business was transacted, faces a change in conditions voluntarily created by itself to its detriment and for which it received presumptively the amount of its damages liquidated by itself and included in the purchase price paid by the city of Mount Vernon.  Nor should the fact that the water plant for the communities which are supplied by it now is oversized, made so by reason of the sale of the Mount Vernon section of the system, be considered in determining a proper rate base, though the present plant now contains elements of value of property used but not useful in supplying present consumers.

However, upon the question of reasonableness and fairness of the rate herein, it is proper to consider the fair value of the company's property at the time of the inquiry.   In the absence of market value, the fair value must be determined from a consideration of all relevant facts such as original construction costs, subsequent expenditures for permanent improvements, the amount and value of the stocks and bonds of the given corporation, the probable earning capacity of the property under the particular rates and the sum required to meet operating expenses.  Moreover, the present, as well as, and compared with, the original cost of construction, must be considered for the reason that an owner whose property is appreciated in value making its fair value more than its original cost, may not be deprived of it without due process of law.  Nor is profit to the company the only or paramount consideration in determining a fair return upon the investment made.   Other relevant facts to be considered in determining reasonableness of rate herein, including the Mount Vernon sale, with its resultant effect on the utility, are the rates charged in the neighborhood, the

question whether or not the company has been fairly dealt with in the past and has received recent rate increases, and the quality of the service rendered.

In determining the fair valuation of the company's property, used and useful, a valuation as of 1924 predicated upon the theory of a " plateau " of prices of commodities, the level of which is 150 as against 100 in 1913–1914, is proper and just to the company and its consumers for the period from 1924–1929. The application of this theory involves the ascertainment of the cost to reproduce the present abnormal plant at pre-war prices, plus fifteen per cent for overhead cost during construction, to which total should be added fifty per cent thereof in order to bring such cost of pre-war reproduction and overhead cost to the " plateau " level. From such total there should be deducted a proper amount covering depreciation increased by fifty per cent, with the addition to such result of the land acquired prior to 1915 and the value of the land acquired since 1915 at its actual book cost, including expenses of acquisition, overheads and commissions and the value of water rights. From the total thus resulting, a proper amount (plus fifty per cent) for overbuilt plant and the amount of property financed by consumers, and the proper amount of functional depreciation should be deducted.

The going value of the corporation is not an element in arriving at a proper rate base for the reason that such an allowance is precluded in this State in the absence of previous deficits, and where it seems that the company at its inception acquired a going concern. Nor can allowance be made for paving over mains.

The so-called straight line method, as a matter of law, was the proper theory in computing an allowance for depreciation. Except as severance damages are reflected in the deduction for overbuilt plant and for proper operating expenses, no severance damages should be allowed, in view of the fact that the company is entitled to a fair return upon the property usefully employed and to be repaid from gross income *inter alia*, only reasonable operating expenses and taxes.

A return of seven per cent, the rate adopted as proper in 1920, still is the proper rate of return on the investment made by the company above reasonable operating expenses, taxes and a reasonable depreciation allowance.

In computing the actual operating expenses for 1924, with the city of Mount Vernon cut off from defendant's system, said expenses should be arrived at by fixing the reasonable operating expenses and taxes, on the theory of a normal utility, from which should be deducted a percentage which the oversized portion of the plant bears to the value of the whole plant.

The claim of the water company covering the extraordinary expenses incurred by reason of this litigation, and made to appear in the year's operating expenses, cannot be allowed, particularly in view of the great disparity between the increased rates fixed by the defendant which are clearly unreasonable and those which are found to have been determined upon the basis of fair valuation.

As a matter of law, the rates promulgated by the defendant and effective March 1, 1924, are unjust and unreasonable for the reason that they will produce for the company the gross sum of $238,435.17, where, as a fact, the company requires for reasonable operating expenses, taxes, annual depreciation allowance and a seven per cent return upon the fair value of its property usefully put to public service only $133,000.17.

The consumers are not entitled to a refund of excess payments made between 1920, when a judgment in a former action to restrain the sale of the defendant's Mount Vernon property was rendered, and the commencement of this action, on the ground that the rates, as fixed by the company after the judgment in that action, were fraudulently represented to be what the said judgment contemplated, though, in fact, they were higher than that determination contem-

plated, in view of the absence of proof showing such representation was made to the consumers. Moreover, assuming such representation and its falsity to exist, the fact that no consumer could have been deceived by the decision which was a matter of public record, precludes any finding as to depreciation.

The judgment in the injunction action is not *res adjudicata* that the rates fixed in 1920 were excessive, for the findings upon the subject of excess rates were not essential to the judgment there rendered.

An increase in the rate for each public fire hydrant in service over the prior rates of from forty dollars to seventy dollars annually, a seventy-five per cent increase, is not fair and reasonable. Moreover, the rule of the water company as to the cost of installing extensions for public fire protection service is unreasonable and violative of the fundamental law prohibiting a municipality from giving money or property or loaning money or credit to and in the aid of individuals or corporations.

Though the court is without power to fix rates, it may determine that rates fixed by the company may not be charged when consumers are faced with the loss of service.

Consequently, judgment should be directed in favor of the plaintiffs permanently enjoining the water company from discontinuing or threatening to discontinue the service of water to the plaintiffs and directing a refund to the plaintiffs and all other consumers entitled thereto, of moneys paid to the water company during the pendency of this action, in excess of the rates prevailing immediately before March 1, 1924.

ACTION by the town of Mamaroneck and others against the New York Interurban Water Company.

*J. Henry Esser*, for the plaintiffs.

*Arthur M. Johnson*, for the defendant.

### *This action and the relief sought.*

GEORGE H. TAYLOR, Jr., J. This action is brought by the plaintiffs, municipalities and individuals therein resident, who are consumers of water, against the defendant, a corporation supplying them with that commodity, to procure a judgment (a) that certain rules and regulations and an increased schedule of water rates and charges effective March 1, 1924, and by the defendant promulgated prior thereto, are unreasonable, unlawful and oppressive, and (b) permanently enjoining the defendant from collecting or attempting to collect those rates for water, from plaintiffs and all others similarly situated. Such other relief as may be just and equitable is also asked.

### *The increased rates.*

On its face the increase appears staggering; for on the basis of water actually consumed and paid for in the district involved, the company received $133,295.25 in 1923 (see Exhibits 9, 26 and C); if the increase had obtained in that year the defendant would have received $238,435.17, or nearly seventy-nine per cent in

excess of the rates then actually obtaining. (See plaintiffs' Exhibit 9 and defendant's Exhibits E and YY as corrected by JJJ.) It also appears that the new rates are much greater than in communities similarly situated. These facts suggest the possibility of unreasonableness.

### The previous rates.

Rates for water were previously fixed by the defendant at a time when the city of Mount Vernon was still in the defendant's system, and were much less than those here involved, and were made effective September 1, 1919; said rates in a certain judgment of March 1, 1920, in an action brought by the defendant against the city of Mount Vernon were in effect declared fair and reasonable in so far as the rates or charges were made equal to all consumers of the same class without distinction as to the municipalities in which they resided or distance of said residences of the municipalities from the reservoirs of the water company; but said judgment also declared, in effect, that the company was then receiving about $30,000 annually in excess of seven per cent return on the court's then declared valuation of the defendant's then property in the public service, and that to the extent indicated by such excess the defendant's rates of September 1, 1919, were not fair and reasonable. (*N. Y. Interurban Water Co.* v. *City of Mount Vernon,* 110 Misc. 281.) Subsequently, in 1920, the defendant readjusted its rates to meet, as it claimed, the findings of the court in that case (although plaintiffs dispute the fact). This readjustment, according to the plaintiffs' contention, brought the defendant considerably more than the fair return indicated by the judgment; the plaintiffs ask here that the defendant should be compelled *inter ali* to refund such excess to the consumers.

### The defendant and its statutory obligation.

The defendant is incorporated under the Transportation Corporations Law, under section 81 of which the defendant is obligated to supply to the plaintiffs and others similarly situated " pure and wholesome water at reasonable rates and cost * * *." The statute says so and the authorities are uniform to that effect; indeed, it is asserted in some of the cases that the duty thereby imposed upon the corporation is a positive and absolute one. (*Matter of Town of Mamaroneck* v. *N. Y., etc., Water Co.,* 203 App. Div. 122; affd., 235 N. Y. 563; *City of New York* v. *Jamaica Water Supply Co.,* 181 App. Div. 49, 52; affd., 226 N. Y. 572; *People ex rel. City of N. Y.* v. *Queens County Water Co.,* 232 id. 277, 282.) That the rates charged shall be reasonable is legally a part of its franchise. (See the opinion of JENKS, J., in *City of Mount*

*Vernon* v. *New York Interurban W. Co.*, 115 App. Div. 658.) So much for the obligation of the defendant to its consumers.

### *The plaintiffs' right to seek injunctive relief.*

That if the plaintiffs' rights have been invaded and the statute violated as alleged in the complaint, the remedy by injunction as here sought is a remedy available to the plaintiffs and those similarly situated, admits of no doubt. (*Whitmore* v. *New York Interurban Water Co.*, 158 App. Div. 178.) The other remedy available, although not here pursued, is mandamus. (*People ex rel. Brush* v. *N. Y. Suburban Water Co.*, 38 App. Div. 413.) The lawful right of any private consumer to insist upon a supply of water at reasonable rates is so clear that it exists even against the agreement of the municipality in which he resides, made with the company, purporting to establish a minimum rate. (*City of Mount Vernon* v. *New York Interurban W. Co.*, 115 App. Div. 658.)

### *The complaint.*

The complaint in this case attacks the instant increased rates originally sought to be enforced as of March 1, 1924, as unreasonable, and also asserts, in effect, that by reason of defendant's certain representations to this court, to the Appellate Division and to the Court of Appeals, in an action brought by some of these plaintiffs, among others, to restrain the then proposed sale by the defendant to the city of Mount Vernon, where the bulk of its customers and the greater volume of its business of supplying water then were, of part of the then plant of the defendant which was located in that city, thereby severing from the defendant's then entire plant such portion thereof and from the defendant the great portion of its business and revenues, the court was induced to refuse to restrain such sale. (See *Town of Mamaroneck* v. *N. Y. Interurban W. Co.* [opinion of Tompkins, J.], affd., 198 App. Div. 396; 233 N. Y. 666.) The plaintiffs claim that by reason of its said conduct and representations in the litigation referred to, and by the findings and judgment therein, the defendant is estopped and precluded from increasing the rates as they existed prior to the increase here complained of; therefore, this litigation presents for determination not only the ordinary question of the reasonableness of rates, but the extraordinary and unusual one relating to such claimed estoppel. I do not agree with defendant's learned counsel that the action is brought to declare the rates attacked " extortionate." " Reasonable " is the statutory word. (Trans. Corp. Law, § 81.) The plaintiffs claim that the rates attacked are unreasonable.

*The defendant's plant and status prior to the sale to Mount Vernon.*

Formerly, and prior to about April 1, 1924, this defendant supplied not only the municipalities which are among the plaintiffs here, but also Mount Vernon to which after the injunction suit referred to had terminated in defendant's favor, the latter sold for $1,187,500 the aforesaid part of its plant; thereby it lost the privilege and duty of supplying that municipality and its inhabitants with ·water, and as above indicated, deprived itself of the greater volume of its prior business and incidentally the greater part of its prior revenue, although it had in hand as a result of the sale, the large sum referred to as the purchase price, which was necessarily potent as a producer of revenue. In addition, as the plant had been constructed in such a way as to supply properly the inhabitants of Mount Vernon, which construction included *inter ali* high duty pumping machinery at Mamaroneck and large pipe lines which were made necessary by the fact that the defendant had Mount Vernon, located some miles from its source of supply, as its principal customer, it had on its hands as a result of its own voluntary sale which it insisted upon making to Mount Vernon (198 App. Div. 396; affd., 233 N. Y. 666), a plant which in many respects was oversized, overbuilt and larger than was necessary for the supply of water to its customers in the outlying district with Mount Vernon cut off, and manifestly much more extensive for that purpose than would have been a plant originally constructed only for the supply of water to the municipalities here plaintiff, with Mount Vernon never in the system. I speak thus of the condition of the remaining plant in spite of some testimony on defendant's behalf intimating in an unconvincing way that the remaining plant had not the characteristics which I mention.

### The claimed estoppel.

As the claimed estoppel, to my mind, presents for solution a question less difficult than others in the case, I will discuss and dispose of it before taking up the other questions involved.

In the injunction suit to restrain the sale, some of those who are plaintiffs here, as plaintiffs there, urged upon this court, in effect, the property right which they had, the inhabitants generally of the outlying district undoubtedly had, in the defendant's plant, because of the fact that the defendant's plant was the only one from which they had obtained or could obtain water, and asserted that by dismembering its plant by the process of cutting off Mount Vernon, the defendant would so cripple itself as to be unable to furnish to the plaintiffs therein and to those similarly situated in the remaining district, water at reasonable rates (see recital

in 233 N. Y. 666).    The plaintiffs there claimed that the defendant would by the sale seriously impair its ability to discharge its public duty.    The defendant, on the other hand, strenuously resisted these contentions.    It there asserted, as appears from the opinion of my learned colleague Mr. Justice Tompkins: " Its purpose to continue its service to the plaintiffs and all others now served by it, and declares its ability to do so at reasonable rates, and fortifies its declaration by the undisputed facts that, with Mount Vernon out of its area of service, the cost of its operations will be materially reduced; its capital will be very substantially increased by the proceeds of the proposed sale, and the sale of other property that will not be necessary by reason of the severance of Mount Vernon from its operating system.    The sum of approximately $78,000 will be the total annual cost of its operations with Mount Vernon cut off, while its gross receipts from the rest of its business will be about $98,000."    (From opinion of Tompkins, J., 198 App. Div. 396; affd., without opinion, 233 N. Y. 666.)

It must be noted that notwithstanding the emphasis with which the defendant water company urged its contemplated ability to discharge its statutory duty to the municipalities in the outlying districts and to the inhabitants thereof, *it made no representation, promise or intimation that it would continue to serve them at the rates then obtaining;* its learned counsel carefully limited its promissory avowals, as I have indicated; and it appears now that before the sale was consummated the defendant's general manager was figuring the largely increased rate involved here.

Appropriate findings gave effect to the above-quoted views of Mr. Justice Tompkins, which were expressly adopted by the Appellate Division, and, at least in their result, by the Court of Appeals. Those views undoubtedly were the result of the evidence submitted on behalf of the defendant water company, and of such representations and arguments made by the learned counsel for the water company, who also appears for the defendant in this case, but who does not here emphasize the same arguments.

In its brief at Special Term, urging that the consummation of the sale to Mount Vernon be permitted, the defendant contended that operating income after Mount Vernon was cut off, would be $98,255.67 per annum; that the proceeds of sale, $1,187,500, would be available for betterments; that more water would be available to the defendant, although some doubt was expressed as to the salability of the excess water; that physical operating expenses to supply the outside localities would be annually $57,566.20, leaving over $40,600 of revenue above such expense, which, however, the defendant admitted would be insufficient to pay taxes, to

cover depreciation and to pay a seven per cent return on the value of the company's property used in supplying the outside municipalities; that there would be no financial inability on defendant's part to operate the remaining plant, the taxes upon which would be $21,051.59 (and possibly even less); finally it was urged that " $78,617.79 [being the operating expense and taxes] constitutes the largest possible amount the water company or the water company property must be financially able to pay in order to have the financial ability to perform its obligation to furnish the plaintiffs pure and wholesome water." Further in that brief the defendant urged that " the revenue from the remaining plant on sales of water at retail to consumers, private and municipal, will aggregate $98,469.89. We submit, therefore, that by these very figures it is demonstrated that the water company *will be able to perform its said obligation.*" (Italics mine.) The learned trial justice decided in defendant's favor upon the evidence submitted and upon such arguments and representations as to the ability of the water company to perform. He held that the facts proven before him on behalf of the then plaintiffs amounted to no more than " a mere apprehension that the water company may not be able in the future to do its duty to the plaintiffs; " this apprehension be held insufficient to warrant the restraint of the sale to Mount Vernon; and directed judgment in the defendant's favor.

Practically the same argument was held by the defendant in the Appellate Division, which affirmed the judgment upon the concise and able opinion rendered in the court below. (See 198 App. Div. 396.) In his Appellate Division brief the defendant's counsel claimed, and called attention to testimony to that effect, that of the $1,187,500 purchase price, about $600,000 was " to cover damage caused to the Water Company's other property by making it less useful, and damage caused by loss of business. *In other words, there must be and is, in that consideration, a substantial amount to cover what is known as ' severance ' damage.*" (Italics mine.) This suggestion may be of assistance when we come to the matter of ascertaining a rate base in the instant litigation. This same brief of the defendant also contained this statement: " *We submit, therefore, that by these very figures it is demonstrated that the Water Company will be able to perform its said obligation [to furnish the appellants pure and wholesome water at fair and reasonable rates].*" The last statement was italicized in the brief which also contained the following, *after suggesting that what is a fair and reasonable rate for the future could not be involved in the action.* The defendant's brief in the Court of Appeals recited: " When a future rate shall be fixed after the contract is consummated, it will be an

interesting question how much of the remaining property is usefully and reasonably employed in the public service. In making that determination and in fixing the rate whoever acts whether Water Company official, or Court, must consider the factors of (1) the consideration of $1,187,500 received from Mt. Vernon including therein some measure of severance damage. (2) The oversize of the remaining plant for the territory supplied, and (3) the result of the oversize plant in increasing operating expenses above normal, and (4) what rate the traffic can and should bear." The efficient general manager of the defendant, who was largely instrumental in fixing the increased rates here involved, in his testimony, in effect, admits that he disregarded most, if not all, of these four factors.

In its brief in the Court of Appeals the same claims were made, including that relating to the large amount of severance damage. The claim as to operating income, approximately $98,000, was made on the basis of rates charged before the raise in rates here complained of; that is, on the basis of rates fixed by the defendant in 1920, as claimed by it to meet suggestions as to fair return in Mr. Justice TOMPKINS' opinion. (*N. Y. Interurban Water Co.* v. *City of Mount Vernon*, 110 Misc. 281.)

The Appellate Division's determination, as previously stated, was affirmed (233 N. Y. 666) by the Court of Appeals without opinion, the sale to Mount Vernon was consummated, the $1,187,500 was received by the defendant and Mount Vernon and its previous revenue to the defendant eliminated.

Clearly these arguments to the courts were urged, and these representations primarily in their nature clearly statements of the defendant's intentions for the future, were made to the court by the company in order that it might accomplish the then desired result, namely, that it might procure a judgment permitting it to proceed to consummate the sale to Mount Vernon, and that it might receive the consideration which in its briefs the defendant, in effect, asserted contained severance damage, and might contain it to the large amount of $600,000. Undoubtedly, also amplifying my previous suggestion, these arguments and representations and the evidence adduced in support of them by the defendant, were large factors in the determinations made respectively in the court of original jurisdiction and in the appellate courts. (*Town of Mamaroneck* v. *N. Y. Interurban W. Co.*, 198 App. Div. 396.) But in determining the effect of the representations there made by the defendant to the court, and whether and to what extent the defendant is estopped, if at all, care must be taken not to charge the defendant with the effect of representations not expressly or by implication made by it.

Practically immediately after the sale, its previous purposes having been accomplished, the defendant promulgated the large increase in rates complained of. Later a letter, dated June 24, 1924, was written by the defendant's local superintendent, in the name of the defendant, to one Eckert, a consumer. It states the claim of the company apparently asserted openly for the first time after its voluntary claimed adjustment of rates to meet Mr. Justice Tompkins' findings of 1920 (upon which a judgment modified or reversed was entered), that the company's consumers had for a long time " enjoyed a water rate much less than was reasonable for a suburban territory, where the investment in plant and the operating cost are such as our company has to meet." Then follows this: " While the City of Mount Vernon was served by our company, it was possible to continue the low rates, because the revenue received from the thickly settled territory in Mount Vernon was large.

" As you know, the City of Mount Vernon has taken over our pipe lines within the city limits, and is now taking its water supply from the City of New York, leaving our plant without the benefit of this revenue. This necessitates the revision of our rates for the remaining territory on a basis consistent with the cost of rendering service."

In other words, we have a situation in which (a) the rates were fixed by the defendant as of September 1, 1919, and readjusted in 1920 to meet, as it claims, a determination which was never reversed or modified, and (b) as to which rates the same defendant, in effect, claimed in 1924, that the same were and had been so low that the consumers " have for a long time enjoyed a water rate which was much less than reasonable for a suburban territory," and in effect that it was impossible to continue the " low rates " which the consumers had theretofore " enjoyed," because Mount Vernon's patronage and the large revenue therefrom were no longer avilable to the defendant, a situation of the defendant's making.

The real reason for the increase in the rates, from the water company's standpoint, was disclosed in this letter and also in others in the record, namely, that it was the city of Mount Vernon taking over the company's pipe lines and taking its supply from New York city to the detriment, from a revenue standpoint, of the defendant, or according to the latter, " leaving our plant without the benefit of this revenue." As previously indicated, the so-called " low rates " were those fixed to meet the determination of 1920. They could hardly be " low " in fact, unless Mr. Justice Tompkins had failed to allow a sufficient return to the

defendant in his said determination; it is significant that defendant accepted Mr. Justice TOMPKINS' determination. The court will take judicial notice that in the year 1920 costs were at their peak and so abnormal as not to be controlling, although, undoubtedly, later utterances of the United States Supreme Court emphasized the propriety of considering the then present prices as he did, although rejecting them in his valuation.

Certain it is that no such statement of the position which the company would occupy with Mount Vernon out of its system, as was set forth in that letter to Eckert and in other letters in the record, was urged upon the court by the defendant in the action to restrain the sale to Mount Vernon. The defendant's learned counsel was then interested in having the sale consummated and acted accordingly, and, for his client, successfully. But on the other hand we must not forget that defendant nowhere represented that its intention was to continue the then rates.

The learned trial justice considered and rejected reproduction costs (less depreciation) " because reproduction cost at present high prices would be unfair to the public " as " the question of permanency or duration of present high prices is so problematical that present cost of reproduction cannot be taken as the principal or controlling element," and held that resort must be had to some fairer method of determining the present value of the plaintiff's property, in so doing following the lead of Mr. Justice HUGHES as referee, in *Brooklyn Borough Gas Co.* v. *Pub. Serv. Comm.* (P. U. R. 1918F, 335). The trial justice then adopted as a basis of his valuation the valuation of the entire plant made in 1913 in the *Whitmore Case (supra)*, which last-mentioned valuation was based upon prewar and normal reproduction costs; and added thereto at cost the increase since 1913 in the value of lands, structures and rights of way owned by the defendant water company, and by a process of reasoning fully set out in his opinion (*N. Y. Interurban Water Co.* v. *City of Mount Vernon*, 110 Misc. 281), fixed the then valuation of the then present useful property of the defendant in the public service at $2,082,782.91 net and found that defendant should receive annually a seven per cent return thereon. The decision valuation was less, viz., $2,041,218.28; and brought down to December 31, 1920, this became $2,048,051.10. (See Exhibits 14 and 11, being Exhibit 55 in the injunction case.)

In the injunction litigation it was found as to matters relating to the claimed estoppel, in effect (a) that with Mount Vernon eliminated the defendant would have an ample supply of pure and wholesome water for the outside municipalities (finding 10), and (b) gross receipts of $98,000 per annum, and operating expenses

without depreciation allowance of not more than $79,000 or $78,000 (findings 11 and 31); (c) that the taxes for 1920 paid, outside of Mount Vernon, were $21,051.59 (finding 32) and that for 1921 taxes would be about $21,000 (finding 33); (d) that $57,566.20 would be the operation cost annually with Mount Vernon cut off, not including taxes, depreciation allowance or any provision for expense of litigation involving rates (finding 34); (e) that the defendant with Mount Vernon eliminated would be entitled to some return, beyond operating expenses, taxes and depreciation allowance, upon the value of the property then devoted to the public use (finding 42); (f) " *that the* " defendant " *has made no statement of what it intends to charge for water with Mount Vernon cut. out of its water works system* " (italics mine) (finding 43). Requests to find presented by the plaintiffs were refused by the trial justice *inter alia* as follows, in effect: (g) He refused to find that the defendant would be entitled to a return of seven per cent or six per cent or five per cent or four per cent or three per cent (requests to find 49 to 53 inclusive) above operating expenses, taxes and depreciation allowance upon such value. He refused to find (h) that the loss of revenue would impair the ability of the defendant to serve the remaining territory with water (requested finding 57), or (i) that such loss of revenue would impair its ability to so furnish water at fair and reasonable cost (requested finding 58), or (j) that such loss of revenue would impair its ability to supply the remaining territory without the company's materially increasing its then water rates and charges (requested finding 59). He refused to find (k) that the consummation of the contract for the sale was an invasion of the rights of the plaintiffs there to continue to receive a supply of water at fair and reasonable cost (requested findings 69 to 71). The judgment followed the findings, dismissed the complaint on the merits and vacated the temporary injunction. (See record in *Town of Mamaroneck* v. *N. Y. Interurban W. Co.*, 198 App. Div. 396; 233 N. Y. 666).

The plaintiffs herein claim that the defendant is estopped by its representations to the court and by said judgment (a) from here contending that it should *not* be compelled to operate on rates yielding a gross income of $98,000, and (b) from arguing that its rates should be increased because of the changed conditions in its system caused by the said sale. The representations which were urged upon the court I have very carefully analyzed. Reduced to their lowest terms they are to the effect (1) that the company, with Mount Vernon eliminated, could and would continue to perform its statutory obligation to the outlying communities; (2) that it would have the necessary financial ability to operate;

(3) that on the face of its then rates it would receive about $20,000, the difference between its gross income annually and operating expenses, plus taxes, which sum of $20,000 would be left to cover depreciation allowance and some return. Concededly, this last-mentioned amount, as defendant there admitted, would not cover depreciation allowance and a seven per cent return, and the defendant's counsel, as above shown, in his brief plainly intimated that a lessened return might be proper with Mount Vernon eliminated.

Nowhere in the record of that case is any argument advanced or any representation made to the court by the defendant in which the latter asserted that it would continue to supply the outlying communities at the then rates fixed in 1920. That was carefully avoided, and a finding (No. 43) determined as a fact that the company " has made no statement of what it intends to charge for water with Mount Vernon cut out   *   *   *."

After careful and protracted consideration I now determine as a matter of law that neither by any representation to the court in the injunction case, nor by the essential findings and the judgment therein is the defendant estopped from raising its rates to the present standard, if the present standard is that of " fair and reasonable " rates under all the circumstances now surrounding this company, some of which circumstances have been created by its voluntary and insisted upon sale of part of its plant to Mount Vernon, then its largest consumer.

As to the other contention of the plaintiffs that the defendant may not argue for an increase of rate merely because of such changed conditions in its system, it is clear that such conditions voluntarily created by the defendant to its detriment, for which detriment it received presumptively the amount of its damage liquidated by itself, included in the purchase price paid by Mount Vernon, cannot be made the basis even in part of an increased rate; and that in so far as this plant for the communities it now supplies is overbuilt and oversize because of the sale to Mount Vernon, it now contains elements of value of property used but not useful in supplying present consumers, for which elements of value presumptively the defendant was paid by Mount Vernon, and which elements, upon plain principles, ought not to be included in the rate base here.

### *The real question — are the new rates reasonable?*

The real question, in my opinion, is whether, under all the circumstances, the increased rates are the " fair and reasonable rate and cost " which alone the statute contemplates shall be charged. If they are fair and reasonable, the plaintiffs must fail

Supreme Court, August, 1925. [Vol. 126

in the action and likewise if plaintiffs fail to sustain the burden of proof upon the issue tendered by them of unreasonableness; if it is demonstrated by the fair preponderance of the credible evidence that the increased rates are unfair and unreasonable, the plaintiffs must prevail. I reject as unsound the argument relating to extortion as distinguished from reasonableness, submitted by defendant's counsel, who apparently asserts that the plaintiffs must do more than prove the rates unfair and unreasonable before they may succeed. The question of fact is whether the increased rates constitute the reasonable compensation which the statute contemplates. (*People ex rel. City of New York* v. *Queens County Water Co.*, 232 N. Y. 277, 282.)

*The claimed presumption of reasonableness of the rates.*

The defendant's counsel contends that in the absence of proof to the contrary there is a presumption of reasonableness. (*Meara* v. *Citizens Water Works Co.*, 110 Misc. 738, 740; *City of Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1; *Silberberg* v. *Citizens Water Supply Co.*, 116 Misc. 595, 600; *People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Pub. Serv. Comm.*, 215 N. Y. 241, 249; *Municipal Gas Co.* v. *Pub. Serv. Comm.*, 225 id. 89, 99.) In the *Meara Case* (*supra*) Mr. Justice Seeger said: " It does not appear that the reasonableness of the rates has ever been questioned " (110 Misc. 738, 740), and then asserts: " In the absence of proof to the contrary the established rate is presumed to be reasonable." That is undoubtedly on the theory of estoppel by the acquiescence of the consumer in the rates fixed by the company. In the case at bar no such thing exists. The rates were here questioned, disputed and resisted upon promulgation or before they took effect. While in the *Silberberg Case* (*supra*), Mr. Justice Faber speaks of the rates fixed by the company as " *prima facie* reasonable," his expression is a mere dictum; his opinion shows that the plaintiff alleged that the increased charges were " beyond the reasonable value of the service furnished by the defendant." This, the justice says, if proven, would entitle the plaintiff to equitable relief; he continues: " But the papers presented, aside from conclusions, disclose no facts which justify the allegation." (116 Misc. 600, 601.) That was the real ground of his then determination. The *City of Knoxville Case* (*supra*) is one in which the authority of the Legislature to fix rates was delegated to the municipality which was by legislative authority empowered to fix by ordinance the price of water to be supplied by the company. (*Knoxville Water Co.* v. *Knoxville*, 189 U. S. 434.) Nothing therein sustains the alleged presumption for which defendant here contends. Such rates so fixed by such authority (derived

by the delegation of the Legislature's power) are indeed presumptively reasonable (See for principle *Pennsylvania R. R. Co.* v. *Philadelphia County*, 220 Penn. St. 100, 108; *Northern Pacific R. Co.* v. *North Dakota*, 236 U. S. 585, 604), but even in such cases the presumption is rebuttable by evidence. (*Northern Pacific R. Co.* v. *North Dakota, supra.*) A reading of the other cases cited does not warrant the suggestion that they held that rates fixed by the company are presumptively reasonable. The *New York Central Case* (*supra*) holds, in effect, that there is no presumption of unreasonableness (215 N. Y. 249). As I read the *Municipal Gas Co. Case* (*supra*), the court in stating that " We must presume, indeed, until the contrary is shown, that they were only reasonable in amount * * * " (225 N. Y. 99), referred to rates received by the company after 1907 down to 1917, and which were fixed by the Legislature. I have not failed to note that Mr. Justice BREWER in *Interstate Commerce Comm.* v. *Cincinnati, etc., R. Co.* (167 U. S. 479) said that Congress, if it did not itself fix the rates, or delegate the authority to a commission " * * * might leave with the companies the right to fix rates, subject to regulations and restrictions as well as to that rule which is as old as the existence of common carriers, to wit, that rates must be reasonable." " Leaving with the company the right to fix rates," even if we concede that the suggestion applies to this case, which I think is doubtful (Trans. Corp. Law, § 81), cannot mean, as far as this case is concerned, a delegation to the defendant of the Legislature's right over rates (See *People* v. *Mayor*, 32 Barb. 102, 119); for the defendant is a private corporation, not a governmental agency and not a subordinate or administrative body whose completed act derives its authority from the Legislature and must be regarded as an exercise of the legislative power. The statute prescribing this defendant's duty to the public (Trans. Corp. Law, § 81 *et seq.*) does not expressly or even by implication delegate the Legislature's authority to the defendant. Such a delegation is never implied. (McLAUGHLIN, J., in *People ex rel. Village of South Glens Falls* v. *Pub. Serv. Comm.*, 225 N. Y. 216, 225.) (See *Matter of Quinby* v. *Pub. Serv. Comm.*, 223 N. Y. 244, 263.) The question whether the Legislature could so delegate its power to the defendant (See *Metropolitan Board of Excise* v. *Barrie*, 34 N. Y. 657, 667) is not here. It has not attempted so to delegate. Therefore, whatever views I may have expressed otherwise in the course of this litigation, I now determine that upon the undisputed facts in the case at bar the defendant is assisted by no presumption that the increased rates and promulgated by it, and promptly and strenuously questioned and resisted by the plaintiffs, are reasonable. There

is no such presumption in this case. (See opinion of Scudder, J., in *Morrell* v. *Brooklyn Borough Gas Co.*, 113 Misc. 65, 69; with whom I agree to the extent of his statement: " Nor can I agree with the further contention that, it is to be presumed that a gas rate which defendant itself has fixed is reasonable.") I respectfully disagree with his further suggestion that the presumption is to the contrary. There is no presumption either way.

### The burden of proof.

It is conceded by plaintiffs and I hold that the burden of proving the claimed unreasonableness and unfairness of the rates in question is upon the plaintiffs.

### Legal principles which are to be considered in valuation.

The principles relating to the determination of the fair value of the defendant's property usefully employed in the public service, or of what is known as the rate base, upon which a fair return must be computed, will now be discussed:

The fair value at the time of the inquiry is what counts. (*State of Missouri ex rel. S. W. Bell Tel. Co.* v. *Pub. Serv. Comm.*, 262 U. S. 276, 287, following *Willcox* v. *Consolidated Gas Co.*, 212 id. 19, 41, 52; *People ex rel. Kings County Lighting Co.* v. *Willcox*, 156 App. Div. 603, 609, 610; 210 N. Y. 479, 484.) Such fair value, in the absence, as in the case at bar, of market value, must be determined by using reasonable judgment, based on proper consideration of all relevant facts. (*Minnesota Rate Cases*, 230 U. S. 352, 434; *Smyth* v. *Ames*, 169 id. 466, 546, 547; *Georgia Railway & Power Co.* v. *R. R. Comm.*, 262 id. 625, 630.)

Relevant facts are, among other possible considerations: (a) original construction costs, (b) subsequent expenditures for permanent improvements, (c) the amount and value of the stocks and bonds of the given corporation, (d) the probable earning capacity of the property under the particular rates, (e) the sum required to meet operating expenses. (*Georgia Railway & Power Co. Case, Smyth* v. *Ames* and *Minnesota Rate Cases, supra.*) " We do not say that there may not be other matters to be regarded in estimating the value * * *." (*Smyth* v. *Ames, supra.*) This last suggestion would undoubtedly cover a case of a utility whose remaining plant the utility has made abnormal through a voluntary sale of part of the plant — as in the case of this defendant. The company is entitled to ask a fair return; but, on the other hand, the public is entitled to demand that no more be exacted by the company than the services rendered are worth. (Cases cited immediately *supra.*)

Also (f) the present as well as, and compared with, the original

cost of construction, must be considered; so that an owner whose property has appreciated in value making its fair value more than its original cost may not be deprived of it without due process of law.   (*Minnesota Rate Cases, State of Missouri ex rel. S. W. Bell Tel. Co. v. Pub. Serv. Comm., supra; Bluefield Co. v. Pub. Serv. Comm.*, 262 U. S. 679, 691.)   The last two cases cited emphasize the propriety of considering present prices, but, in my opinion, do not conflict with the views and determinations of ex-Justice HUGHES, as referee, and Mr. Justice TOMPKINS as to the consideration of present or reproduction cost as a relevant fact (*Brooklyn Borough Gas Co. Case,* P. U. R. 1918F, 335; *N. Y. Interurban Water Co. v. City of Mount Vernon*, 110 Misc. 281), particularly in view of the United States Supreme Court's views by implication at least condemning " slavish adherence " to abnormal reproduction costs. (*Georgia Railway & Power Co. Case, supra,* 629, 630.)

Upon the subject of making an intelligent forecast of probable future values upon a view of all the relevant circumstances, which view the Supreme Court of the United States has declared essential, that court has said: " If the highly important element of present costs is wholly disregarded, such a forecast becomes impossible. Estimates for tomorrow cannot ignore prices of today." (*S. W. Bell Telephone* and *Bluefield Cases, supra.*)

Again, I agree with plaintiffs' counsel that in determining a fair return (g) profit to the company is not the only or paramount consideration.   (*Cotting v. Kansas City Stockyards Co.*, 183 U. S. 79, 96; *Smyth v. Ames*, 169 id. 466, 544, citing *Covington & L. Turnpike Road Co. v. Sandford*, 164 id. 578, 596; *Minneapolis & St. L. R. R. Co. v. Minnesota*, 186 id. 257, 268.)   " * * * the principle must be when reasonableness comes in question, not what profit it may be reasonable for a company to make, but what it is reasonable to charge to the person who is charged." (BREWER, J., in *Cotting Case, supra,* quoted from an English precedent.)   " The rights of the public are not to be ignored.   * * * The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends." (HARLAN, J., in *Smyth v. Ames, supra,* 545.) " * * * while the rule stated in *Smyth v. Ames* is undoubtedly sound as a general proposition, that the railways are entitled to a fair return upon the capital invested, it must not justify them in charging an exorbitant mileage in order to pay operating expenses, if the conditions of the country did not permit it." (*Minneapolis & St. L. R. R. Co. Case, supra.*)   It is clear that the considerations last referred to relating to fairness to the public have a peculiar significance in the case of this utility now, as above suggested, in an abnormal condition because of its voluntary sale to Mount Vernon.

I have determined also (h) that the Mount Vernon sale with its resultant effect on the utility must be considered as a relevant fact. (See for principle, *Matter of Coalinga Consolidated Water Co.*, 14 Cal. R. R. Com. 618, 619.) The Coalinga Company had disposed of part of its plant to the city of Coalinga. The Commission there made a suggestion which is pertinent here: " Prior to that sale certain definite portions of the charges, both fixed and operating, were justly found chargeable to that portion of the business which was sold, namely, the City of Coalinga. *These matters must have been considered and compensated for in the sale price.*" (Italics mine.) " It would be manifestly unfair to now ask the remaining consumers to pay increased rates to cover any deficit in these charges, for the loss of which the company has already been compensated. The Commission in its decision * * * must take those matters into consideration * * *." Indeed, in his argument before the Court of Appeals, set forth in his brief in the injunction case, the defendant's counsel, whose consummate ability as a lawyer is acknowledged, in effect admitted that the sale to Mount Vernon would be a relevant fact for consideration in determining the future rate base. He argued: " In making that determination and in fixing the rate, whoever acts, whether Water Company official, or Court, must consider the factors of (1) the consideration of $1,187,500 received from Mt. Vernon, including therein some measure of severance damage; (2) the oversize of the remaining plant for the territory supplied, and (3) the result of the oversize plant in increasing operating expenses above normal, and (4) what rate the traffic can and should bear." In his same brief he also suggested the possibility that the future might disclose that a lesser rate of return than that which would be fair to a normal utility would be fair to this one, as to its remaining plant made abnormal by the sale. These arguments are not given a prominent, or indeed any, place in his brief in this case. In the injunction case the defendant's counsel said: " But the rate must be such as the traffic should bear even if what would otherwise be a fair rate of return is lessened." (*People ex rel. Kings County Lighting Co.* v. *Willcox*, 210 N. Y. 479.) I think his reasoning was sound then, and that its soundness survives.

(i) Rates charged in the neighborhood are relevant facts for consideration. (*State Public Utilities Comm. ex rel. City of Springfield* v. *Springfield G. & E. Co.*, 291 Ill. 209; 125 N. E. 891; P. U. R. 1920C, 640; *Wildwood* v. *Wildwood Water Works Co.*, 2 P. U. Com. N. J. 218, 250.) " * * * perhaps no better test can ordinarily be found than the rates customarily charged in localities similarly situated. And yet this test is not by any means infallible.

What is a reasonable return is a question of fact, the solution of which calls for the exercise of sound judgment and common sense. *Duluth Street Railway Co. v. Railroad Com.*, 161 Wis. 245; 152 N. W. 887." (Opinion of the Illinois Supreme Court in *State Public Utilities Case, supra.*) Mr. Justice Swayze used about the same language in another case in New Jersey (*Public Service Gas Co. v. Public Utility Board*, 84 N. J. L. 463, 474, 475. See, also, the *Wildwood Case, supra*, and *State ex rel. Watts Engineering Co. v. Public Service Commission*, 269 Mo. 525; 191 S. W. 412; P. U. R. 1917C, 581, 588.)

(j) Weight must be given also to the question whether the company has been fairly dealt with in the past and has received recent rate increases. (For principle, examine *Matter of Stockton Springs Water Co.*, P. U. R. 1920E, 918, 923.) This defendant fixed certain increased rates as of September 1, 1919; after the decision of March, 1920, they were readjusted, as claimed by the defendant, to meet that decision. Mr. Justice Tompkins' decision was based upon consideration — and rejection as not controlling — of the then present prices which were then at their peak, and have since receded to a very great extent. It is true, however, that a large part of his then valuation used as a rate base was found on 1913 or pre-war prices, which he, exercising the independent judgment of the court in that case, considered proper.

(k) The quality of the service rendered is a relevant fact for consideration (*Matter of Southern California Telephone Co.*, P. U. R. 1924C, 506, 510.) The water supplied by the defendant while not always ideal in quality, I find complies with the statutory requirements as to quality.

I have set forth what I consider to be the relevant facts to be considered; but I do not say that they are the only relevant facts.

*Mr. Justice Tompkins' valuation — not that of the present dismembered plant; such basis and other suggested bases of valuation not adopted here.*

Mr. Justice Tompkins in his valuation did not appraise the present plant in its over-built state as a separate entity. The plaintiffs' learned counsel suggests certain bases of valuation, each founded upon the appraisal made by Mr. Justice Tompkins of the then entire plant, including Mount Vernon, and by an arithmetical process based upon the testimony in the case assumes to arrive at a valuation of the present plant. Undoubtedly it is the law that " When the value of a plant has been properly determined by the regulating authority and suitable allowance is made for the investment in subsequent additions, it is manifestly proper to

26

calculate the fair return upon this basis, at least for a reasonable period." (Ex-Justice HUGHES in *Brooklyn Borough Gas Co.* v. *Pub. Serv. Comm.*, P. U. R. 1918F, 335, 349; and see *Petersburg Gas Co.* v. *City of Petersburg*, 132 Va. 82; P. U. R. 1922C, 172, 189 [Virginia Supreme Court of Appeals]; opinion, TOMPKINS, J., in *N. Y. Interurban Water Co.* v. *City of Mount Vernon*, 110 Misc. 281.)

If Mr. Justice TOMPKINS *had*, in 1920, valued the present abnormal utility, his valuation, with some possible modifications, would have been, in my opinion, a fair starting point or foundation for the valuation in this case; but, as above indicated, he valued the then entire plant and did not separately appraise the remaining property then usefully employed in the public service in the district outside of Mount Vernon. To deduce a proper then valuation of the remaining plant from his finding of value of property then usefully employed in the then entire plant, I consider impossible; because it would involve taking the testimony of the expert, who in that case testified — without any evidence offered by defendant challenging his testimony — as to the actual value of the property sold to Mount Vernon. Subtracting that actual value from Mr. Justice TOMPKINS' total valuation, the result thus obtained clearly would *not* be *his* (Mr. Justice TOMPKINS') judicial appraisal of the present abnormal plant, even if a deduction figured by the expert and not by Mr. Justice TOMPKINS for oversize of the remaining plant were made from the result of that subtraction. Therefore, while respectful of his determination, I have determined that I will not use Mr. Justice TOMPKINS' valuation in any respect as a basis of the court's valuation in this case of the remaining plant usefully employed in the public service.

The defendant's counsel suggests a valuation based on the testimony and computations of an expert called by him and upon other prior computations, said to be justified by those made subsequently by the expert. Such other prior computations were made by or under the direction of the general manager of the defendant before the Mount Vernon sale was consummated and anticipating its consummation, and which computations were used by the general manager in fixing the rates here complained of. I am not intimating that there are not other serious objections to the adoption of the valuation results arrived at by that expert and that company manager, when I assert that I deem it my duty to reject their suggestions as to the present value of the property usefully employed, because, in my opinion, the said witnesses give too great weight to reproduction costs — even if their suggestions do not amount to that " slavish adherence " thereto spoken of and in effect rejected in the *Georgia Railway & Power Co. Case* (*supra*). As to other

suggested bases of valuation, in view of the determination which I am about to indicate as to the proper basis to be used, I will not add to the length of this opinion by discussing them in detail. In passing, however, I desire to state that I appreciate the efforts of counsel in suggesting them for my consideration, and that they have been carefully considered, although not adopted.

### The valuation here.

Considering all the factors which I have enumerated as entering into a fair valuation in the instant situation, I have determined that the basis of valuation of the company's property, used and useful, which takes into account the witness Hollander's interesting theory of a " plateau " of prices of commodities, which he predicts will continue until 1929, is the one which is and will be fair to the defendant and its consumers for the period from 1924 to 1929, at least. That witness said: " * * * * prices have tended to stability around a level of 150. * * * " He took the pre-war prices for 1913–1914 as being 100. He further said: " All my argument is that any commodity which was selling, let's say, at a remunerative price at 100 in 1913–1914, will now or ought to bè selling approximately at 150 and may be counted to continue so." Exhibit 42, being " Index Numbers of Wholesale Prices — U. S. Department of Labor," in evidence, and a continuation of that index which I have consulted and of which I take judicial notice, practically bear out Professor Hollander's theory of stability of prices of all commodities from about 1922 up to the time of his testimony and from that time to the present. Prices have shown such stability at about 150 as to justify his theory. Therefore, I hold that a valuation here as of 1924, in the light of that theory, will be proper and just to all concerned until 1929, at least. I do not agree with plaintiffs' counsel's suggestion that this theory is not in accord and does not harmonize with the principles set forth in the opinions of courts and commissions as to what is fair value for rate-making purposes. Indeed, such theory of the " plateau " of prices has not been used apparently to any great extent. It has been employed, however, in several cases (See opinion of Brandeis, J., in *State of Missouri ex rel. S. W. Bell Tel. Co.* v. *Pub. Serv. Comm.,* 262 U. S. 276, 301), and this new plateau method, but with the plateau at thirty-three and one-third per cent above the pre-war level, was used in *Galveston Elec. Co.* v. *City of Galveston* (258 U. S. 388, 392). Therefore, it is not an altogether novel method of dealing with a valuation. Its use is in harmony with the principle that each valuation, notwithstanding all that is said in the precedents which are helpful as guides to an

appraising tribunal, still stands on its own basis. It is still the duty of the court in each case to exercise its independent judgment in determining the value. (*Georgia Railway & Power Co. Case, supra.*)

Professor Hollander's theory advanced in 1924, in this case, is that commodity prices generally will stabilize on a plateau of fifty per cent above normal or pre-war level of 1913–1914. Upon all the evidence I determine that fifty per cent is proper in the case of the present utility; and as plaintiffs' counsel suggests, that economist believes that the lower prices will ascend and the higher ones descend to the plateau level of 150, the pre-war, as above stated, being 100. It is this theory which will be availed of as the basis of this court's independent judgment in fixing the valuation here.

The application of the theory involves: (1) The ascertainment of the cost to reproduce the present abnormal plant on the basis of pre-war prices; (2) the addition to that ascertained amount of a proper percentage — the defendant claims that seventeen and one-half per cent and the plaintiffs that fifteen per cent only is proper — for overhead cost during construction; upon all the evidence I determine that fifteen per cent is proper in the case of the present utility; (3) the addition to the then total of fifty per cent thereof to bring such cost of reproduction (pre-war) and such overhead cost to the plateau level; (4) the deduction from the then total of a proper amount for depreciation, increased by fifty per cent. The addition to the then result (5) of the land acquired prior to 1915, and the value of the land acquired since 1915, and in fact acquired in 1923, at its actual book cost, including expenses of acquisition, overheads and commission, and the value of the water rights as stipulated, together with a suitable amount representing material and supplies, office furniture and cash working capital. From the total thus resulting (7) a proper amount (plus fifty per cent thereof) for overbuilt plant, *and* the amount of property financed by consumers, *and* a proper amount of functional depreciation, should be deducted. The then result will be the valuation of the property of the company usefully employed in the public service, in the independent judgment of this court. I will set forth the figures by which the valuation is arrived at and will discuss later the reasons for the adoption of those figures which I consider merit such discussion.

*Figures involved in the valuation now made (Read Schedules A and B attached).*

Cost to reproduce on the basis of pre-war prices:

| | | |
|---|---:|---:|
| Distribution system.... ............................... | $535,218 | |
| Supply works....................................... | 101,712 | |
| | | $636,930 |
| Overhead fifteen per cent. | | |
| Distribution system................................ | $80,283 | |
| Supply works....................................... | 15,257 | |
| | | 95,540 |
| Total (physical plant plus overheads)........................ | | $732,470 |
| Add fifty per cent to bring to plateau level....................... | | 366,235 |
| Total at plateau level (physical plant plus overheads)........ | | $1,098,705 |
| Deduct for accrued depreciation: | | |
| On distribution system............................. | $103,429 | |
| On supply works.................................. | 24,804 | |
| | $128,233 | |
| Plus fifty per cent.................................. | 64,117 | |
| | | 192,350 |
| Total at plateau level (physical plant and overheads) less such depreciation......................................... | | $906,355 |
| Add value of land acquired prior to 1915............... | $26,316 | |
| Add land acquired since 1915 (at actual book cost), including expenses of acquisition, overheads and commission paid to American Pipe Company.......... | 25,005 | |
| Add value of water rights (stipulated)................. | 10,000 | |
| Add material and supplies, cash working capital and office furniture, at the figure which I now fix and allow. | 30,000 | |
| | | 91,321 |
| | | $997,676 |
| Deduct: | | |
| For overbuilt plant at pre-war prices........ $93,907 | | |
| Plus fifty per cent......................... 46,954 | | |
| | $140,861 | |
| Property financed by consumers............ $38,425 | | |
| | 38,425 | |
| Functional depreciation............................. | 50,000 | |
| | | 229,286 |
| The result is this court's valuation which is the rate basis as I have determined it.................................... | | $768,390 |

This valuation fixed by the court is much greater (if we exclude plaintiffs' instant price suggested valuation of $724,757) than the maximum suggested by the plaintiffs, to wit, $479,234.81; and likewise much less than the maximum valuation suggested by the defendant, to wit, $1,736,953, which is very much inflated.

The pre-war cost of the distribution system as I have determined it at $535,218, is somewhat higher than contended for by the plaintiffs; the excess amount in my finding results (a) from increased allowance over plaintiffs' figures for galvanized or wrought iron pipe; (b) for valves and boxes, and (c) for meters; also from increased allowance for rock excavation work, as to which plaintiffs claim 22,200 cubic yards, and the defendant claims over 43,000 yards. As to this item of rock excavation, after consideration of all the evidence, I have determined that the plaintiffs' figures as to rock excavation are too low, and the defendant's figures are too high. I determine that 35,000 cubic yards is the fair figure.

No going value has been allowed. (See opinion of Tompkins, J., in *N. Y. Interurban Water Co.* v. *City of Mount Vernon*, 110 Misc. 281, 287, and cases there cited.) In the absence of proof offered by the defendant of early deficits, the rule in this State precludes the allowance of going value as an element in the rate base. This company, in 1901, acquired a going concern with customers; it did not initiate a new enterprise and " work up " the patronage. Whatever may be the rule in other jurisdictions on this subject, in New York it is as I have stated. (*People ex rel. Kings County Lighting Co.* v. *Willcox*, 210 N. Y. 479, 492.) This rule is in line with what has been said by the Supreme Court of the United States. (*Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153, 165.) The claimed item for paving over mains has been intentionally disallowed by me, as I adopted the views of the plaintiffs and plaintiffs' expert in that respect, and no amount therefor is included in the court's valuation.

In relation to depreciation, I have adopted the method employed by the plaintiffs' expert, Weston Fuller — the so-called straight line method — (examine *Matter of West St. Louis Water & L. Co.*, P. U. R. 1922E, 805, 824, 825, and numerous cases there reviewed), which I hold as a matter of law to be the proper one to be applied under all the evidence in this case. It is practically the method of figuring an accrued actual depreciation which has been followed by the defendant, particularly at times when it was not desirable to decrease the depreciation so as to increase the value of the property usefully employed. By this method accrued actual depreciation is deducted, as it should be, in determining the present fair value of the physical plant. (Examine *City of Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 13, and *Minnesota Rate Cases*, 230 id. 352.)

The defendant in this case seeks to use the straight line method in computing annual depreciation allowance, and to shift from its practice for years of using the straight line method as to

actual accrued depreciation, to the sinking fund method, which lessens the amount of the depreciation and consequently makes the figured valuation greater — a higher rate base. This shift is unjust to the consumers for the reasons well stated by Chairman Stevens of the New York Public Service Commission, Second District, in *Fuhrmann* v. *Cataract Power & Conduit Co.* (3 P. S. C., 2d Dist., N. Y. 656, 720). I adopt his reasoning. The accrued depreciation, and the annual depreciation allowance for the latter of which provision must be made in the rates charged will be determined by the court here upon the straight line method.

As to overhead cost during construction of the present comparatively small plant, I have adopted, as previously indicated, the fifteen per cent as contended for by the plaintiffs rather than the seventeen and one-half per cent as urged by the defendant.

No severance damages, except as the same are reflected in the deduction for overbuilt plant and in my findings of proper operating expenses, are deducted; because I determine as a matter of law that the consumer is interested legally in severance damages only to the extent just indicated. This proposition follows from the legal truisms (a) that the company is entitled to a fair return upon the property *usefully employed;* and (b) that the company is entitled to be repaid from gross income *inter alia,* only reasonable operating expenses and taxes — meaning reasonable under all the circumstances, including the circumstance of an overbuilt plant containing elements of value of property used but not useful in the public service.

*The rate of return here fixed at seven per cent per annum.*

After much study I have determined that seven per cent, the rate of return adopted as proper in 1920 by Mr. Justice TOMPKINS in the case of this utility, which then included Mount Vernon, is still the proper rate of return. Applied to the rate base above found, to wit, $768,390, it gives the result of $53,787.30, which amount I determine that the defendant should receive annually above reasonable operating expenses and taxes and a reasonable depreciation allowance. The rate of return to be allowed in a given case is dependent upon the particular facts of that case; it is not to be fixed arbitrarily. (*Dayton-Goose Creek R. Co.* v. *U. S.,* 263 U. S. 456, 486; *Willcox* v. *Consolidated Gas Co.,* 212 id. 19, 48.)

*Operating expenses and taxes fixed at $71,941.87. Annual depreciation allowance fixed at $7,271.*

No evidence as to actual operating expenses for 1924 with Mount Vernon out of the system has been presented, and no application

has been made by either party to reopen the case, although briefs were not submitted until April, 1925, and my determination is being rendered in August of that year. Evidence has been presented, however, upon the subject of operating expenses for the year 1923 — on the plaintiffs' behalf by an expert who gave his opinion figures upon what they should be for the year 1923, and for 1924 in the case of the dismembered plant; and on the part of the defendant by the defendant's general manager, who purported to allocate from the 1923 operating expenses for the entire plant the portion thereof applicable to the present utility — and this evidence I must use as the basis of my estimate of the proper operating expenses for the year of the inquiry, 1924. The defendant's general manager, in his testimony, claimed that the gross consumption for 1924 would practically be the same as that of 1923 under the new rates, because the decreased consumption because of economical reasons by consumers under the increased rates would offset the consumption of water by new customers. This was disputed by the plaintiffs but I have adopted it, as will appear later. As to the reasonable operating expenses for 1924, from all the evidence in the case relating to this abnormal utility, I find that reasonable operating expenses and taxes for the year are $71,941.87. (Schedule C.) These are the net figures now fixed for the operation of this oversize plant. (See Schedule C, annexed.) The proposition by which I have arrived at the same is substantially as follows: (1) I have fixed the reasonable operating expenses and taxes first on the theory that this is a normal utility, and (2) then I have deducted from that result fifteen and five-tenths per cent, which is the percentage which the oversize portion of the plant bears to the value of the entire physical plant. (See Schedule C.) The defendant contended that the operating expenses with some suggested possible deductions for water charges in 1923, and some other deductions for taxes, would be $122,978.56; the water purchased in 1923 amounted to upwards of $18,000, with Mount Vernon in the system, and 1923 was a year of drought; the plaintiffs claim that $1,000 allowance for purchase of water would be ample. The plaintiffs' expert, Gannert, claimed that the plant could be operated for $70,944 for the year. In passing I state that I have disregarded the defendant's percentage agreement with its parent company in making what I consider to be fair and just allowances for the items of operating expenses.

Under the situation disclosed in this case I have determined to make no allowance for any part of the extraordinary expenses involved in this litigation over rates fixed at an abnormally high point by the defendant, and not prescribed by legislative authority.

(See *San Diego Water Co.* v. *San Diego*, 118 Cal. 556, 572; *Reno Power, L. & W. Co.* v. *Pub. Serv. Comm.*, 298 Fed. 790; P. U. R. 1923E, 485, 500, and cases there cited.) I disallow the claim of the defendant to have these extraordinary expenses appear even in part in the year's operating expenses, particularly in view of the great disparity between the increased rates fixed by the defendant and those which I find should have been had upon the basis of a fair valuation. None of the expenses of this litigation over the rates should in justice be borne by the consumers. In this connection it is to be noted that this is not a case of litigation over a presumptively reasonable rate made by the Legislature itself or some public body to which legislative authority has been delegated.

In fixing the taxes I have taken the defendant's item of taxes paid in 1923, to wit, $29,216, and have deducted therefrom $3,073, which concededly should not be included, leaving a result of $26,143. (See last column of Schedule C.) I have determined to leave this last-mentioned tax figure without increase for 1924.

Other items of operating expenses which I have allowed (See last column of Schedule C, and to which I do not here specifically refer), are: (a) Those as to which the evidence presents no dispute as to their propriety, which I have allowed at the agreed figures; and (b) those which were in dispute which I resolved, as indicated in the last column of Schedule C, on a basis in each instance which appeared to me, exercising the court's independent judgment, to be fair to the defendant and its consumers, in the case of this utility abnormal now through the voluntary sale to Mount Vernon.

The company " is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning." (*City of Knoxville Case, supra.* See 2 Whitten Val. Pub. Serv. Corp. 1126.) On this theory, of course, there must be — as both sides conceded — a proper annual depreciation allowance. Using the method of depreciation referred to, the sum is fixed at $7,271. This is one per cent of $727,069, being the court's value of the physical plant at the plateau level, to wit, $906,355, less the amount therein represented by overbuilt plant, to wit, $140,861, and less, also, the value of property financed by consumers, to wit, $38,425.

The operating expenses and taxes as fixed by the court, to wit, $71,941.87 (being $84,637.48 on the theory of an abnormal utility, less $12,695.61, deducted for operating expenses caused by oversized plant) and the said annual depreciation allowance, to wit, $7,271, in the aggregate amount to $79,212.87.

*Résumé of the court's value of property usefully employed, the seven per cent annual return, operating expenses, taxes and depreciation allowance; showing excessive gross receipts by the defendant.*

| | |
|---|---:|
| Value of property usefully employed (rate base)................ | $768,390 00 |
| A seven per cent annual return thereon is...................... | 53,787 30 |
| If we add thereto operating expenses, taxes and depreciation allowance.............................................. | 79,212 87 |
| There results as proper operating expenses, taxes, depreciation allowance and a seven per cent return...................... | $133,000 17 |
| Taking the conceded receipts upon the amount of consumption in 1923 (used, as aforesaid, for 1924) as they would be if figured on the basis of the increased rates, as ultimately corrected in defendant's Exhibit JJJ, we have............................ | $238,435 17 |
| Deducting therefrom the above aggregate of operating expenses, taxes and depreciation allowance and the seven per cent return, or......................................... | 133,000 17 |
| There remains an excess of the annual receipts for 1924, over such operating expenses, taxes, depreciation allowance and a seven per cent return, or................................... | $105,435 00 |

Upon the facts as found, as above indicated, I now determine as a matter of law as of 1924, the time of the inquiry, that the rates promulgated by the defendant and effective March 1, 1924, are unjust and unreasonable in that (1) they will produce for the year for the water company the gross sum of $238,435.17, whereas the company requires for reasonable operating expenses, taxes, annual depreciation allowance and a seven per cent return upon the fair value of its property usefully employed in the public service, *only* $133,000.17, and in that (2) the increased rates here reviewed will produce for the defendant $105,435 in excess of what is proper to take care of the items just indicated, including the return of seven per cent upon such value.

Upon the rate base fixed by the court, to wit, $768,390, the defendant from gross annual income of $238,435.17, would pay for operating expenses, taxes and depreciation allowance, $79,212.87, leaving in its hands $159,222.30 for its return — or a return upon the said rate base which would be twenty and seven-tenths per cent, clearly an excessive return, and nearly three times what it should be under the findings of the court in the case at bar.

### The refunds claimed by the plaintiffs.

These are of two classes: (1) Those claimed because of the excess moneys paid by consumers who have paid the same during the pendency of this action, being moneys paid over and above what would have been paid by the consumers in accordance with the schedule of 1920 promulgated after Mr. Justice Tompkins' decision;

as to refunds in this category, the judgment will direct that they be made to each consumer, who has paid such excess.  (See stipulation, Plaintiffs' Exhibit L.)   (2) The plaintiffs claim, in effect, that the rates demanded in 1920, by the defendant, as fixed by the company after Mr. Justice Tompkins' decision, were higher than that decision contemplated, and intimate, although they do not expressly say it, that the defendant, in effect, represented that they were what Mr. Justice Tompkins' decision contemplated, that the representation was knowingly false, and that the consumers were deceived and were damaged to the extent of the excess payments made between 1920 and 1924; in short, that all the elements of actionable fraud were present, to the damage of the consumers, and the claim appears to be made that such excess is in the nature of money had and received in the hands of the defendant, which in good conscience belongs to the consumers and should be returned. I dispose of this claim in so far as it may be based upon claimed fraudulent representations by the defendant, by determining as I now do: (a) That the proof does not establish any such representation to the consumers by the defendant, and (b) that, assuming such representation and its falsity to exist as facts, and that the defendant knew its falsity at the time, I hold that it is clear that no consumer could have been deceived thereby, because as Mr. Justice Tompkins' decision was a matter of public record open to him, there is no proof of any deception.   I overrule the contention of the plaintiffs that the judgment in the injunction suit is *res adjudicata* as to this excess.   I do not think that the findings upon the subject of such claimed excess were essential to the judgment there rendered, and that they are, therefore, of no moment legally, even if we assume that all other elements of a former binding adjudication are shown in the evidence.   The decision and judgment to be entered hereon will, therefore, contain no provision for refunds by the defendant to consumers, of the claimed excess payments made between 1920 and March 1, 1924.

*The defendant's rates and rules for fire service.*

The rules in question are:

' PUBLIC FIRE PROTECTION SERVICE

" For each public fire hydrant in service, the base rate will be $70.00 per year, payable monthly.  Said base rate will be adjusted from time to time, in accordance with the following rule governing extensions of water mains made upon the order of municipalities.

" When extensions of water mains are ordered for public purposes by municipalities, the Company shall be furnished with a certified

copy of a resolution by the governing body of the municipality, setting forth in detail the extension ordered. Upon completion of said extension a statement of the cost of same will be furnished to the municipality. At the end of each year during the term of ten years following the date upon which the Company is ready to render service through said extension, the base rate for fire protection service will be adjusted in the following manner:

" A charge equal to 20% of the cost of installing said extension will be made to the municipality ordering the same. Against this charge there will be credited the amount collected from customers whose properties abut and who secure service from said extension, including any fire hydrant revenue received from the municipality for hydrants connected to said extension. If the amounts collected from said consumers, and for said fire hydrants on said extension, are not sufficient, to cover said annual charge, the balance due will be made up by adding to the base rate of $70.00 per fire hydrant, a *pro rata* charge for each hydrant in use, sufficient to cover said balance."

The above rule involves an increase over the old rates of from forty dollars to seventy dollars per year for hydrants — 75 per cent increase. I find as a fact that the increase rate is not fair and reasonable. Aside from other considerations which militate against the validity of that portion of the rule about to be discussed, and which other considerations I find it unnecessary to discuss here, the rule quoted, in my opinion, in effect, makes the municipality finance the extension of water mains belonging to the company and ordered by the municipality for public purposes, if, indeed, it does not work a gift of such extensions from the municipality to the water company. Nothing in the rule negatives the proposition that after a given extension is installed, it is the company's property and not the municipality's property. For ten years the municipality must pay annually to the company 20 per cent of the cost of installation, or 200 per cent thereof in all. The municipality may, indeed, receive back some or all of this payment, and it may not. The rule is unreasonable on its face and void as to the part now discussed as to the municipalities affected. To say nothing of the manifestly unreasonable feature involved, the ten annual installments aggregating 200 per cent of the installation cost payable by the municipality for property to belong for all time to the water company (even in the light of the suggested possible credit to the municipality), I think it clear that this rule contemplates a violation of the fundamental law which prohibits a municipality from giving " any money or property " or from loaning " its money or credit to or in aid of any individual, asso-

ciation or corporation   *   *   * nor shall any such [municipality] be allowed to incur any indebtedness except for county, city, town or village purposes." (N. Y. State Const. art. VIII, § 10; *Admiral Realty Company* v. *City of New York*, 206 N. Y. 110, 129, 132.) It does not seem possible that any lawyer could have had a part in formulating this rule. On its face it is the work of a layman. I determine against the validity of that part of the rule relating to extensions, for the reasons given, and, as above indicated, omit any discussion of the other considerations said to militate against it.

Under the stipulation in this case (Plaintiffs' Exhibit I) it is provided: " the municipalities shall pay monthly on account on hydrant rentals demanded by the company, an amount based upon the old rates, all parties agreeing to readjust the amounts payable for hydrant rentals on the basis of the judgment to be rendered herein." Under my determination above made with relation to the public fire prevention service, if the municipalities pending this litigation have paid the old hydrant rental they will have discharged their obligation in full in that respect.

*No rate is fixed by the court herein; and no rate is forecast for the future.*

What the court has done is to make a finding on the subject of the reasonableness of the present rates. In so doing it has valued the property of the defendant used and useful, and has indicated a fair rate of return thereon. All this has been done simply in the process of ascertaining whether the increased rates here attacked represent fair and reasonable cost. While the court has no rate-making function, it may determine what rates may not be charged under the menace of cutting off the service. (*Whitmore* v. *New York Interurban Water Co.*, 158 App. Div. 178, 179, 180.) This is the effect of what the court has done in the instant case.

*Conclusion*

In concluding I express my appreciation of the conduct and efforts of the learned counsel on both sides of the controversy. Each one is a specialist now in this class of litigation; their briefs and views have been helpful to me in arriving at a result which I hope may be found just to the water company and to the plaintiffs and the other consumers; the questions involved I think are of too great importance to rest entirely upon the determination and views of one judge. In the event that an appeal from the determination about to be announced is taken, I will be glad to co-operate with the parties to have the same speedily heard in the appellate court.

*The judgment herein.*

Judgment is directed in favor of the plaintiffs against the defendant only as follows:

(a) Permanently enjoining the defendant from discontinuing or threatening to discontinue the service of water to the plaintiffs, or any of them, or any of the plaintiffs' consumers, because of a refusal to pay therefor at the increased rates in dispute in this action, namely, those promulgated to be effective March 1, 1924.

(b) Directing a refund to the plaintiffs and to all other consumers entitled thereto, of all moneys paid to the defendant during the pendency of this action in excess of the rates prevailing immediately before March 1, 1924.

(c) Awarding taxable costs and disbursements to the plaintiffs against the defendant.

Settle decision and judgment on notice. Submit requests to find upon which I will pass. If any possible arithmetical errors are found in my computations they may be corrected in the decision.

### Schedule A

Shows as to distribution system (1) the quantities of wrought or galvanized iron and cast iron pipe, (2) valves and boxes, (3) hydrants, (4) meters and (5) rock excavation — as contended for by plaintiffs' and defendant's experts respectively, the court's finding as to such quantities, the unit cost (pre-war) and the cost of reproduction pre-war; and the cost of reproduction of the supply system at pre-war prices, viz.:

DISTRIBUTION SYSTEM

| ARTICLE | Testimony of Weston Fuller | Testimony of G. W. Fuller | Court's finding as to quantity | Unit cost (pre-war) | Cost to reproduce (pre-war) |
|---|---|---|---|---|---|
| Galvanized or wrought iron pipe: | | | | | |
| 1 inch............... | 256 | ........ | 256 | $0 20 | $51 |
| 2 inches............ | 1,032 | 1,032 | 1,032 | 35 | 361 |
| 3 inches............ | 6,829 | 6,829 | 6,829 | 45 | 3,073 |
| 5 inches............ | 1,600 | 1,600 | 1,600 | 55 | 880 |
| Cast iron pipe: | | | | | |
| 4 inches............ | 21,588 | 21,613 | 21,613 | 55 | 11,887 |
| 6 inches............ | 224,720 | 228,634 | 228,634 | 75 | 171,475 |
| 8 inches............ | 29,364 | 29,364 | 29,364 | 1 02 | 29,951 |
| 10 inches............ | 21,020 | 21,020 | 21,020 | 1 32 | 27,746 |
| 12 inches............ | 14,629 | 13,015 | ........ | ...... | ........ |
| | | 1,614 | | | |
| | | (14,629) | 14,629 | 1 64 | 23,992 |
| | | siphon | | | |

DISTRIBUTION SYSTEM — *Continued.*

| ARTICLE | Testimony of Weston Fuller | Testimony of G. W. Fuller | Court's finding as to quantity | Unit cost (pre-war) | Cost to reproduce (pre-war) |
|---|---|---|---|---|---|
| 16 inches............ | 39,731 | 39,400 | ........ | ...... | ......... |
|  |  | 331 | ......... | .... ... | ........ |
|  |  | (39,731) | 39,721 | $2 42 | $96,149 |
|  |  | siphon |  |  |  |
|  |  |  |  |  | $365,565 |
| Valves and boxes: |  |  |  |  |  |
| 1 inch............. | 2 | ........ | 2 | 4 50 | $9 |
| 2 inches........... | 5 | 6 | 6 | 7 00 | 42 |
| 3 inches........... | 6 | 6 | 6 | 8 50 | 51 |
| 4 inches........... | 203 | 201 | 203 | 11 00 | 2,233 |
| 5 inches........... | 1 | 1 | 1 | 13 25 | 13 |
| 6 inches........... | 657 | 657 | 657 | 15 50 | 10,184 |
| 8 inches........... | 29 | 29 | 29 | 22 00 | 638 |
| 10 inches........... | 26 | 26 | 26 | 26 50 | 689 |
| 12 inches........... | 9 | 9 | 9 | 38 50 | 346 |
| 16 inches........... | 18 | 18 | 18 | 68 50 | 1,233 |
|  |  |  |  |  | $15,438 |
| Hydrants: |  |  |  |  |  |
| 3 inches........... | 6 | 6 | 6 | 21 00 | $126 |
| 4 inches........... | 189 | 189 | 189 | 27 75 | 5,245 |
|  |  |  | 249 |  |  |
| 6 inches........... | 249 | 249 | (444) | 33 00 | 8,217 |
|  |  |  |  |  | $13,588 |
| Meters: |  |  |  |  |  |
| $\frac{5}{8}$ inch............. | 2,850 | 2,863 | 2,863 | 10 00 | $28,630 |
| $\frac{3}{4}$ inch............. | 97 | 99 | 99 | 12 00 | 1,188 |
| 1 inch............. | 46 | 47 | 47 | 18 50 | 869 |
| 1½ inches.......... | 12 | 11 | 12 | 38 00 | 456 |
| 2 inches........... | 27 | 28 | 28 | 53 00 | 1,484 |
| 4 inches........... | 4 | 4 | 4 | 180 00 | 720 |
| 6 inches........... | 6 | 5 | 6 | 380 00 | 2,280 |
|  |  |  |  |  | $35,627 |
|  | cu. yds. | cu. yds. | cu. yds. |  |  |
| Rock excavation........ | 22,200 | 43,258 | 35,000 | 3 00 | $105,000 |

*Summary of pre-war cost of distribution system as found by the court*
(No overhead costs added)

| | |
|---|---|
| Pipe lines..................................... | $365,565 |
| Valves and boxes............................ | 15,438 |
| Hydrants...................................... | 13,588 |
| Meters................... ................. | 35,627 |
| Rock excavation............................. | 105,000 |
| Total................................. | $535,218 |

*Supply works*
*Cost of supply works at pre-war prices*
(No overhead cost added)

| | |
|---|---|
| Supply works.............................. | $101,712 |

*Schedule B*

Shows result of depreciation, by method adopted by the court; it shows (1) the cost to reproduce pipe, pre-war, from Schedule A, without addition of overhead cost as to distribution system, the (2) percentage of accrued depreciation, (3) accrued depreciation, (4) cost to reproduce pre-war less depreciation (read in connection with Schedule A); also shows (a) pre-war cost of supply works without overhead cost added and (b) percentage of accrued depreciation adopted and (c) such accrued depreciation, and (d) cost to reproduce works, pre-war less depreciation.

Distribution System

| ARTICLE | Cost to reproduce pre-war from Schedule A | Percentage of accrued depreciation | Accrued depreciation | Cost to reproduce pre-war, less accrued depreciation |
|---|---|---|---|---|
| Galvanized or wrought iron pipe: | | | | |
| 1 inch | $51 | 2.0 | $1 | $50 |
| 2 inches | 361 | 6.0 | 22 | 339 |
| 3 inches | 3,073 | 27.1 | 833 | 2,240 |
| 5 inches | 830 | 28.0 | 246 | 634 |
| Cast iron pipe: | | | | |
| 4 inches | 11,887 | 18.8 | 2,235 | 9,652 |
| 6 inches | 171,475 | 15.1 | 25,893 | 145,582 |
| 8 inches | 29,951 | 15.8 | 4,732 | 25,219 |
| 10 inches | 27,746 | 17.1 | 4,745 | 23,001 |
| 12 inches | 23,992 | 16.7 | 4,007 | 19,985 |
| 16 inches | 96,149 | 21.8 | 20,960 | 75,189 |
| | $365,565 | 17.4 | $63,674 | $301,891 |
| Valves and boxes (see Schedule A), total | $15,438 | 17.4 | $2,686 | $12,752 |
| Hydrants: | | | | |
| 3 inches | $126 | 27.0 | $34 | $92 |
| 4 inches | 5,245 | 11.9 | 624 | 4,621 |
| 6 inches | 8,217 | 15.9 | 1,306 | 6,911 |
| | $13,588 | 14.4 | $1,964 | $11,624 |
| Meters: | | | | |
| $\frac{5}{8}$ inch | $28,630 | 10.4 | $2,978 | $25,652 |
| $\frac{3}{4}$ inch | 1,188 | 4.1 | 49 | 1,139 |
| 1 inch | 869 | 4.3 | 37 | 832 |
| 1$\frac{1}{2}$ inches | 456 | 7.8 | 36 | 420 |
| 2 inches | 1,484 | 5.1 | 74 | 1,410 |
| 4 inches | 720 | 8.5 | 61 | 659 |
| 6 inches | 2,280 | 4.8 | 109 | 2,171 |
| | $35,627 | 9.3 | $3,344 | $32,283 |
| Rock excavation | $105,000 | 17.4 | $18,270 | $86,730 |
| *Supply works* | | | | |
| | $101,712 | 21.2 | $21,563 | $80,149 |

## *Schedule C*

Relating to the annual expense of operation of the present abnormal utility as of the time of this inquiry, and showing (1) the subject of the expense, (2) the estimate of the defendant's manager, (3) the estimate of the plaintiffs' expert Gannett, and (4) the court's finding of the proper amount as to each subject of expense; also relating to depreciation allowance.

| Subject of Expense | Roth (defendant's Exhibit B) | Gannett (plaintiff's 26) | Allowance by court here, on assumption of utility being normal |
|---|---|---|---|
| Purification system, expense | $1,162 17 | $1,162 17 | $1,162 17 |
| Pumping system, labor | 12,366 41 | 9,500 00 | 10,000 00 |
| Pumping system, fuel | 18,483 54 | 9,500 00 | 12,500 00 |
| Pumping system (misc. supplies) | 1,154 58 | 650 00 | 800 00 |
| Distribution expense | 5,435 83 | 5,435 83 | 5,435 83 |
| Purification system expense (mechanical filters) | 3,215 82 | 1,750 00 | 2,500 00 |
| Repairs, water collecting system | 495 74 | 100 00 | 250 00 |
| Repairs, purification system | 246 40 | 246 40 | 246 40 |
| Repairs, pumping system | 1,049 05 | 1,049 05 | 1,049 05 |
| Repairs, distribution system (mains and accessories) | 1.382 85 | 1,382 85 | 1,382 85 |
| Repairs, distribution system (service pipes and stops) | 333 38 | .......... | .......... |
| Repairs, distribution system (meters and boxes) | 336 05 | .......... | .......... |
| Repairs, distribution system (fire hydrants) | 328 77 | 328 77 | 328 77 |
| Administration expense | 14,469 51 | 4,800 00 | 9,000 00 |
| Accounting and commercial expense | 7,863 43 | 7,863 43 | 7,863 43 |
| Legal expense | 2,762 01 | 1,000 00 | 2,000 00 |
| Insurance | 1,721 22 | 1,200 00 | 1,200 00 |
| Water purchased | 14,481 90 | 1,000 00 | 1,000 00 |
| Store and stable (auto) | 1,897 01 | 1,200 00 | 1,200 00 |
| Miscellaneous general expense | 404 68 | 404 68 | 404 68 |
| Taxes | 29,216 91 | 22,200 00 | 26,143 00 |
| Rent expense | 171 30 | 171 30 | 171 30 |
| | $122,978 56 | $70,944 48 | $84,637 48 |

Note.— Expense and taxes allowed by the court on the assumption of normal utility .................................... $84,637 48

Deduct 15 5/10% (being percentage of the value of the entire physical plant, which is represented by the value of the over-size portion, as ascertained) .............. 12,695 61

Balance, being annual operating expenses and taxes allowed by this court ...................................... $71,941 87

Note.— In the above intentionally no allowance is made for any part of the expenses of the litigation over the rates.

### *Depreciation allowance*

1% on $727,069 ............................................. 7,271 00

Total operating expenses, taxes and depreciation allowance ... $79,212 87